Allan R. HACKEL, Individually and as Trustee of Hackel Properties Trust, Plaintiff/Defendant-in-Counterclaim,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, As Liquidating Agent of Capitol Bank and Trust Company, Defendant/Plaintiff-in-Counterclaim.

Civ. A. No. 92–10031–EFH.

United States District Court, D. Massachusetts.

July 21, 1994.

Mark A. Berthiaume, Goldstein & Manello, Boston, MA, for plaintiff.

Clark van der Velde, F.D.I.C., Franklin, MA, Jonathan W. Fitch, Andrea Peraner–Sweet, Sally & Fitch, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

This is a civil action, tried to the Court sitting without a jury, in which the Plaintiff/Defendant-in-Counterclaim, Allan R. Hackel ("Hackel"), seeks a Court Declaration that he is not obligated to perform under a certain note and guaranty due to the alleged breach of a related commercial lease by the Defendant/Plaintiff-in-Counterclaim, Federal Deposit Insurance Corporation ("FDIC"). In response, the FDIC counterclaims for breach of the note and the guaranty.

In August of 1986, Capitol Bank and Trust Company ("Bank"), a Massachusetts banking corporation, elected to seek a buyer for its principal offices located at One · Bulfinch Place, Boston.[1] Subsequently, Mr. Hackel and the Bank entered into negotiations for the sale and lease-back of the property. As a result in September, 1986, Mr. Hackel and the Bank agreed that Mr. Hackel, through the Hackel Properties Trust,[2] would purchase One Bulfinch Place at a price of $18,-000,000, with $4,000,000 to be paid in cash to the Bank and the remaining $14,000,000 by note to the Bank. An additional $300,000 was added to the Note for expenses incurred in securing the loan. In turn, the Bank agreed to lease the property back from Mr. Hackel for rent sufficient to service the $14,-300,000 Note, pay all real estate taxes and operating expenses, and provide Mr. Hackel with a return on his $4,000,000 cash investment. Mr. Hackel also agreed to execute a Limited Guaranty in the amount of $2,000,-000 to secure personally the obligations under the $14,300,000 Note. At closing, on September 30, 1986, the parties simultaneously executed the Purchase and Sale Agreement, the Note, the Guaranty, and the Lease.

On December 29, 1990, the Commissioner of Banks for the Commonwealth of Massachusetts declared the Bank insolvent and appointed the FDIC as receiver for purposes of liquidation. Between December 29, 1990 and May 31, 1991, the FDIC continued to pay Mr. Hackel the rent due under the lease.[3] On May 31, 1991, however, the

---

1. Title to One Bulfinch Place was held by John Parigian and Sidney Weiner as Trustees of the Hawkins Street Trust, a duly recorded nominee trust in which the Bank was the sole beneficiary. Messrs. Parigian and Weiner also served as officers and directors of the Bank.

2. The Hackel Properties Trust is a real estate trust organized under the laws of the Commonwealth of Massachusetts under a Declaration of Trust dated September 30, 1986, recorded in the Suffolk County Registry of Deeds.

3. The testimony submitted during trial, however, clearly establishes that the FDIC failed to make rental payments under the lease from May 31, 1991 to August 29, 1991, when the FDIC finally relinquished possession of the property. In specific, Richard W. Jagolta, an FDIC Account Officer, testified that the FDIC had failed to make rental payments under the lease for the months of June, July, and August, 1991.

FDIC, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1821(e), disaffirmed the lease and made no further rent payments to Mr. Hackel. This suit resulted soon thereafter.

■ The Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") grants the FDIC the authority to disaffirm or repudiate contracts or leases entered into by failed institutions.[4] Mr. Hackel's primary contention, however, is that because the Note, Limited Guaranty, and Lease constitute a single, integrated, bilateral transaction, a judicially created exception to FIRREA is invoked, depriving the FDIC of its right to disaffirm the Lease. *FDIC v. Laguarta*, 939 F.2d 1231, 1238–39 (5th Cir.1991); *Baumann v. Savers Federal Savings & Loan Association*, 934 F.2d 1506, 1516–18 (11th Cir.1991); *Howell v. Continental Credit Corp.*, 655 F.2d 743, 746 (7th Cir.1981); *McAndrews v. New Bank of New England*, 796 F.Supp. 613, 616 (D.Mass.1992); *Monument Square Assoc. v. Resolution Trust Corp.*, 792 F.Supp. 874, 876–77 (D.Mass. 1991).[5] In response, the defendant claims that while the Lease, Note, and Limited Guaranty were all part of a larger transaction, they did not lose their character as separate and distinct agreements, and, therefore, did not amount to a single, integrated transaction.

■ In reviewing the evidence submitted at trial, the Court looks to Massachusetts state law in determining the question of integration.[6] Under Massachusetts law, whether separate documents should be read together as one integrated agreement is a question of fact which turns upon the intention of the parties. *Holmes Realty Trust v. Granite City Storage*, 25 Mass.App.Ct. 272, 275, 517 N.E.2d 502, *further app. rev. denied*, 401 Mass. 1105, 519 N.E.2d 1348 (1988).[7]

In this case, the facts do indeed require a finding that the Lease, Note, and Limited Guaranty are all parts of a single, integrated transaction.[8] It is clear from the Note that there would be no default under the Note if

4. Section 212(e)(1) of FIRREA provides that the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—

    (A) to which such institution is a party;
    (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
    (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.
    12 U.S.C. § 1821(e)(1).

5. Assuming arguendo that this Court finds that the FDIC had the right to repudiate or disaffirm the Lease, Mr. Hackel submits that the FDIC did not properly conclude that the Lease was "burdensome" or that the disaffirmance would "promote the orderly administration of the institution's affairs." In this regard, the Court does not agree. The uncontradicted testimony of Ms. Dorothy Lovenbury clearly establishes that the FDIC followed a prudent methodology in arriving at its conclusions.

Moreover, the Court rejects Mr. Hackel's suggestion that the FDIC failed to disaffirm the Lease within a reasonable period of time. Mr. Hackel introduced no evidence during trial to show that the four and one-half months between the FDIC's appointment and the Lease's disaffirmance was unreasonable. *See Monument Square Assoc.*, 792 F.Supp. at 878–79 (unreason-ableness of predisaffirmance period is dependent upon circumstances of each case).

6. As there is no federal law governing the construction of contracts, state law applies in determining whether separate written contracts constitute an integrated agreement. *See Rey v. Lafferty*, 990 F.2d 1379, 1386 (1st Cir.1993) (applying Massachusetts law). In the instant case, Massachusetts law applies because the documents themselves require that they be construed under the law of Massachusetts. *See Monument Square Assoc.*, 792 F.Supp. at 877 (adhering to contractual provision stipulating to usage of Maine law). Further, Massachusetts is the state with closest connection to this transaction.

7. In *Holmes*, the Massachusetts Appeals Court suggested that courts consider four factors in determining whether the parties intended separate agreements to be integrated: (a) the business context in which the agreements were entered into; (b) the results intended to be accomplished; (c) the identity of the subject matter addressed in the agreements; and (d) the simultaneous execution of the two documents. *Holmes Realty Trust*, 25 Mass.App.Ct. at 275, 517 N.E.2d 502.

8. It is important to note that while the FDIC claims that the Note, Lease, and Limited Guaranty do not equate to an integrated agreement, the FDIC has failed to introduce even a scintilla of evidence supporting their claim.

such default was attributable to the Bank's failure to make payments under the Lease. Indeed, the Note expressly made performance by the Bank under the Lease a condition precedent to recovery under the Note. In this regard, the Note provides:

The Principal Amount, plus accrued interest, shall become due and payable at the option of the Holder upon the happening of any event by which said balance shall or may become due and payable under the terms of the aforesaid Mortgage or in the event that any payment of principal or interest due hereunder shall not be paid when due within seven (7) days after written notice from the Holder to the Maker; provided, however, that, for such period of time as Hawkins Street Trust as aforesaid is the Holder of this Note and not otherwise, *if such default shall be attributable in whole or in part to a default by Capitol Bank and Trust Company (the "Bank") in the payment of rent or other monetary obligations as Tenant under a certain lease of even date herewith between the Maker as Lessor and the Bank as Lessee, then and in such event no payment shall be considered in default hereunder until such default by the Bank is cured and the Holder shall have no right to accelerate payment of this Note nor shall any additional interest be charged by reason thereof.*[9]

Furthermore, the Lease explicitly makes reference to the Note and the sums due thereunder. In specific, the rent provision of the Lease provides that:

Lessee covenants and agrees to pay Lessor without offset or reduction, and without previous demand therefor, basic fixed rent ("Basic Fixed Rent") *at the annual rate of the product of the following (x) Fourteen Million Three Hundred Thousand ($14,300,000) Dollars, and (y) the annual constant payment of principal and interest due under the Note....*

Clearly, the parties intended the rental payments under the lease to service the payments and costs resulting from the Note.

In addition, under the provisions of the Limited Guaranty, Mr. Hackel's personal liability is triggered only if he defaults under the Note. Thus, collection on the Limited Guaranty is dependent upon the enforceability of the Note. Finally, it is important to note that the Lease, Limited Guaranty, and Note were all negotiated during the same time and simultaneously executed on September 30, 1986. It logically and inescapably follows that these documents are integral parts of a single, indivisible transaction.

Accordingly, the Court finds, on the basis of the documentary evidence, that the Lease is an integrated and indivisible part of one agreement relating to a single transaction. Therefore, when the FDIC disaffirmed the Lease, it necessarily repudiated the entire agreement, of which the Lease was an integral part. As a result, the Note and Limited Guaranty, other integral parts of the same agreement, became null and void and, thus, unenforceable. *See Texas Commerce Bank Nat'l Assoc. v. Capital Bancshares, Inc.,* 907 F.2d 1571, 1577 (5th Cir.1990) (FDIC's repudiation of data processing agreement voided obligations under a note as they were part of integrated agreement). The Court concludes that it would be contrary to the dictates of logic and equity to require Mr. Hackel to make payments under the Note to the FDIC

---

**9.** Additionally, the Purchase and Sale Agreement that was executed together with the Note and the Lease made the delivery and execution of the Lease a condition to delivery and execution of the Note. The Purchase and Sale Agreement provides, in relevant part:

Seller shall cause to be submitted to the Buyer originals or copies of each of the foregoing documents and at the Closing originals of the following documents shall be delivered.

\*    \*    \*    \*    \*    \*

(x) the lease, a copy of which is attached hereto as Exhibit 3 ("Lease"), *fully executed by the* *Tenant, together with evidence of authority for the officer executing the Lease and an opinion of counsel to the tenant named in the Lease to the effect that all necessary corporate action has been taken on behalf of the tenant, and that the Lease is the valid and binding obligation of the tenant enforceable in accordance with its terms.* Said opinion shall opine equally with respect to the execution and delivery of the Title Deed and all other documentation to be delivered by the Seller.

when the sole source of such payment, the Lease, has been discontinued by the FDIC.

SO ORDERED.